Williams v. Whitmore.

SARAH A. WILLIAMS v. M. D. WHITMORE et al.

1. CHANCERY PLEADINGS AND PRACTICE. *Land sales. Taxes.* It is the duty of the court under the act of 1871, upon all lands sold under decree of the court, to have a reference to the clerk and master as to the amount of taxes due upon day of sale, and this before confirmation of sale, but if by inadvertence this is omitted, it may be done after confirmation at any time while the funds are under the control of the court. The amount of taxes is to be paid out of the purchase money. If the sale is confirmed and the amount of purchase money is paid, or the notes for the purchase money delivered to creditors or their solicitors without payment of taxes, the court may, at the same term of the court, order the funds to be refunded for payment of taxes.

2. ATTORNEY'S LIEN. *Chancery Pleadings and Practice.* Where a lien upon a fund in court is declared in favor of two firms of solicitors and the same is insufficient to pay both, the court will not permit one firm to appropriate the fund to their fee. If there is not a sufficient fund to pay both, the lien should be enforced *pro rata*, and if one firm of solicitors has drawn the fund, the court will order it paid into court to be divided *pro rata*. If one of the firm who drew the fund is insolvent, the court will compel the partner who is solvent to pay the sum, although the partnership may have been dissolved after the beginning of suit and before the decree, and the solvent partner had no knowledge of the transaction, and received no part of the money.

3. ATTORNEYS. *Partnership.* Upon a dissolution of a law firm, in the absence of an agreement to the contrary, either member may give his attention to and, in the absence of the other, control any unfinished cases in which the firm may have been employed. As to such unfinished business they are still partners.

4. SAME. *Same. Liabilities of partners.* If a partner receive more than he is entitled to within the scope of his partnership, the firm must refund the excess.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

T. B. TURLEY for Harris.

J. E. BIGELOW for Hill.

GEO. GILLHAM for Fares.

HUMES & POSTON for Humes, Scott & Poston.

McFARLAND, J., delivered the opinion of the court.

This cause is before us upon two separate appeals. presented at different times, by Isham G. Harris, from decrees rendered against him in relation to matters incidental to the original litigation.

Separate transcripts were made out upon each appeal, embracing such parts of the record as were thought to be pertinent to the questions involved. These transcripts contain in part the same matters, but each contains some part of the record not found in the other. The questions arising upon each appeal grow out of the same transaction, and for convenience, will be considered together. The original bill was, in substance, for the collection of a debt and for the sale of lands that had been fraudulently conveyed by the debtor. The complainant was successful, obtaining in this court, at the September term, 1875, a decree in her favor for a sum of money, for the collection of which the cause was remanded for a sale of the lands and further proceedings. The decree of this court declared a lien on the recovery in favor of Messrs. Humes & Scott and Messrs. Harris & Pillow, for their services as solicitors, in favor of the complainant. The first named were surviving partners of the firm of Poston,

Humes & Scott, who has filed the bill. Messrs. Harris & Pillow were partners at the time of their employment, but the partnership had been dissolved before the decree was rendered.

On the 24th of June, 1876, the lands (being several town lots in or near the city of Memphis), were sold by the master, and the sale reported on the 3rd of October, 1876, and confirmed by a decree entered on the 27th of October, but there was at the time no divestiture or vestiture of title, the cause being retained on the docket to await the collection of the purchase money. The sale aggregated $4,275, each purchaser executing three notes, due severally in 7, 12 and 18 months, payable to the master, for the aggregate amount of his purchases as follows: J. B. Fares, the purchaser of two lots, executed three notes aggregating $1,550; J. A. Anderson, notes for three lots, aggregating $1,195; Joseph H. Hill, for two lots, $500; Arthur E. Hill, two lots, $680, and G. J. Pillow, two lots, $350.

Previous to said sale, to-wit, on the 9th of February, 1876, an order was entered reciting the lien declared by this court in favor of Messrs. Harris & Pillow, for their fees, and also, that they had filed a petition praying that the amount of their fees be fixed by the court, which had been served upon the complainant, and directing that the petition be taken for confessed, and that the matter be referred to the master to report the amount of the fees as early as practicable. On the 14th of the same month, on motion of Humes & Scott, surviving partners, a further ref-

erence was made, directing the master to report upon their fees, at the same time he reported upon the fees of Harris & Pillow, and directing that notice be served on the complainant. On the 2d of October, 1876, the master made a report alone as to the fees of Messrs. Harris & Pillow, fixing the amount at $2,000, and on the day the report of sale was confirmed, to-wit, the 27th of October, 1876, this report as to fees was confirmed by a decree which directed the master to turn over to said Harris & Pillow, said sum of $,2000, *of the notes then in his hands,* the proceeds of said sale, and take their receipt therefor, and on the 31st of said month, the master delivered to Gen. G. J. Pillow, of said firm of Harris & Pillow, two of his own notes, two of the notes of J. B. Fares, and two of the notes of J. A. Anderson, aggregating $1909.98, and took his receipt, signed by himself for "Harris & Pillow," and on the 3rd of January following, the master paid Gen. Pillow $90.02, making in all $2,000.

After the report of the master of the 2d of October, 1876, as to the fees of Harris & Pillow, and the confirmation thereof, on the 27th of October, as before shown, to-wit, on the 19th of December, 1876, the master, in obedience to the order of reference of the 14th of February, reported that the entire fee to the complainants in the case should be $2,500, of which Poston, Humes & Scott should receieve $1,600. This report was confirmed on the 26th of January, 1877, except as the decree says, "so much of the report as refers to the fee of Messrs. Harris & Pillow

which is not acted upon by the court, as the same had heretofore been acted upon." Messrs. Humes & Scott agree to remit $100 of the amount allowed them, and the balance, $1,500, was directed to be paid to them in the notes of the purchasers, or in money first arising from the proceeds of sale after the payment of costs. Shortly before this last decree, to-wit, on the 6th of January, 1877, a decree was entered showing that Gen. G. J. Pillow had transferred the two lots purchased by him to J. B. Fares, and title was vested in said Fares accordingly.

On the 21st of February thereafter, Messrs. Humes & Scott filed their petition, which was afterwards lost or mislaid, but they subsequently, under leave of the court, filed a substituted petition. The petition sets forth the facts hereinbefore recited. Shows that the firm of Poston, Humes & Scott was the original counsel in the case. That the report of the 2d of October, 1876, as to the fees of Harris & Pillow, and the decree confirming the same, and allowing them to withdraw $2,000 of the notes, was *ex parte* as to said petitioners, and inadvertently made. That there was a large amount of taxes due upon the land, which, with the costs, should be first paid out of the proceeds of the sale, and this being done would leave of the fund not exceeding $2,000. That they had received only $150 for their fee, and Messrs. Harris & Pillow having withdrawn $2,000 of the notes, there would be no fund left to pay petitioners or the balance of the taxes. The lien declared by this court in favor of complainant's counsel being joint, they in-

sisted upon their right to have it enforced for their benefit jointly with Messrs. Harris & Pillow, in accordance with their respective rights, and to enforce this lien, they pray that Messrs. Harris & Pillow be required to refund a sufficient amount of the fund to enable the court to do equity.     On consideration of this petition, a decree was made by the chancellor on the 23d of March, "suspending" the allowance to Messrs. Harris & Pillow, and the order under which the notes were turned over to Gen. Pillow, and the decree vesting title in Fares and directing that said decree remain suspended until the facts of said petition should be determined.     This was during the same term of the court at which the orders and decrees so suspended were made; but as before stated, the notes had already been turned over to Gen. Pillow before the suspending order was made.

On the 14th of February, 1878, J. B. Fares, one of the purchasers, filed his petition or affidavit, in which, after stating that he was purchaser of two of the lots, shows also, among other things, that he had purchased from Gen. Pillow the two lots purchased by him.     That of his two notes turned over to Gen. Pillow, as before shown, he had paid the first.     The other had been, by Gen. Pillow, transferred to Estes, Fizer, & Co., who had brought suit upon it.     Petitioner had paid his third note to the master in taxes due upon the land at the time of the sale.     That he had also paid to Gen. Pillow the amount of his (Gen. Pillow's) notes, given for two lots purchased by him, which, as we have seen, was part of the notes turned

over to Gen. Pillow in payment of his fees. The petitioner, Fares, having purchased these lots from Gen. Pillow, paid him the amount of his own notes. The petitioner then states that he paid of the taxes, which constituted a charge upon the lots at the time of the sale, $18.57 more than the amount of his third note, which he had in this mode taken up, that there yet remains of said taxes $510.75, 'which sums should be paid out of the proceeds of the sale, and which was more than his remaining note outstanding in the hands of Estes, Fizer & Co. The petition insists, that as a matter of law, that the unpaid taxes should be paid out of the proceeds of the sale, but states in addition, that at the sale of the lots it was so announced by the master. In this he is sustained by the affidavits of the master and W. A. Hill, previously filed. This petition prays that his last note in the hands of Estes, Fizer & Co., be brought into court and canceled upon the payment of the taxes. The petition shows that part of the unpaid taxes were upon the two lots purchased by Gen. Pillow and sold to petitioner.

An agreement of counsel was filed showing that the firm of Harris & Pillow was dissolved previous to the hearing of the cause in 1876. Gov. Harris becoming publicly known as a member of another firm in October, 1874. That the employment of the firm of Harris & Pillow in this case was previous to the dissolution—that Gen. Pillow took charge of, and gave his attention to the case—that all the proceedings in relation to the fee in this case in the name of Harris & Pillow, were conducted by Gen. Pillow after

the dissolution—that the notes were received by him. and appropriated to his own use. Gov. Harris received. no part of said sum, and had no knowledge of the transaction, and that Gen. Pillow was indebted to him on their partnership account. ·

Upon the foregoing facts, the cause was, on the 13th of July, 1878, heard upon the motion of "Hill, Fares and Anderson," to have Messrs. Harris & Pillow pay in a sufficient amount of the fund withdrawn by them to pay any balance of unpaid taxes, and the court being of opinion that the taxes due upon the land at the time of the sale, should be paid before the solicitors were entitled to withdraw any of said fund, sustained the motion, and ordered Messrs. Harris & Pillow to pay in a sufficient amount of the fund withdrawn by them to pay said taxes, and referred the cause to the master to report the amount of said taxes. Before taking this account, however, Gov. Harris was allowed to appeal, and this is the appeal. brought up in the first of the transcripts.

Subsequently the cause was heard upon the motion and petition of Humes & Scott, when the further facts. were agreed to, that upon the dissolution of the firm. of Harris & Pillow, each partner went forward to wind up and collect the unfinished business, not, however, attending to the same cases, and that the notes received by Gen. Pillow netted $2,000 3d of January, 1877. The cause was referred to the master to report as to the taxes chargeable upon the land at the date of the sale and the costs. He reported, setting-forth the taxes, and showing that after paying the

taxes which were chargeable upon the property at the date of the sale, and the costs of the cause, there would be left of the proceeds of the sale, $1092.04. That Messrs. Humes & Scott, surviving partners, were entitled to two-thirds of the fees allowed in the case, and Messrs. Harris & Pillow one-third. That Gen. Pillow, for Harris & Pillow, had received $2,000 of the fund, and Humes & Scott had received $150  The court, thereupon, rendered a decree in favor of Humes & Scott against said Harris, surviving partner, Gen. Pillow having in the meantime died, for $500 (Humes & Scott agreeing to claim only that amount), and the costs accruing on said petition.

From this decree said Harris again appealed, which is the cause embraced in the second transcript.   The first question is whether the purchasers of the land have the right to have the taxes then chargeable thereon paid out of the proceeds of the sale, or did they purchase subject to the taxes?

It was held in the case of *Stanton* v. *Harris*. 9 Heis., 579, that at a judicial sale for debt, the purchaser takes the property subject to the taxes, and is entitled to no abatement on that account, but it seems to have been held differently in the case of *Ellis* v. *Foster*, 7 Heis., 131.   The case of *Childress* v. *Vance*, 1 Baxt., 406, holds that the purchaser, after paying for the land, may recover of the debtor the taxes which the purchaser was compelled to pay.   This is also inconsistent with the theory that the purchaser buys subject to the taxes.

The question, however, now turns upon the con-

struction of the act of 1871, if the rule be considered otherwise doubtful, the cases referred to having arisen previous to said act. It is entitled, "An act to provide for the collection of all taxes that are a lien upon real estate sold under the decree of any court in this State," and is as follows: " Whenever real estate is sold under a decree of any court in the State, it shall be the duty of the judge of said court, before the sale is confirmed to the purchaser, to have a reference made to the clerk, or clerk and master, to ascertain, if upon the day of sale, there were any taxes due and unpaid, which were a lien upon said real estate, and if it be found that there were taxes that were a lien upon the real estate upon the day of sale, a decree shall be entered in the cause stating the amount of the taxes, and directing the clerk and master, or clerk, to pay said taxes out of the first money collected from the sale of the said real estate."

The object of the statute was to expedite the collection of public taxes, it was passed in the interest of the public. It, however, establishes the rule as held in *Ellis* v. *Foster*, for it in terms provides that the taxes shall be paid out of the first money collected from the sale, and this necessarily implies that the purchaser gets the benefit of the payment. That is to say, he pays his purchase money to the clerk and out of this money the taxes are paid. He does not buy subject to the taxes. If the statute simply means that the court is to direct the clerk to take the first money paid in *as the money of the purchaser* and pay the taxes, the result would be that the

money thus used to pay the taxes would not be a credit on the purchase notes. The creditor or parties in interest would have the right to compel the purchaser to pay the whole amount of his notes or his bid, over and above the amount paid in by him, and used to pay taxes. That is to say, take the first money paid in and apply it to the taxes, but give the purchaser no credits upon his purchase notes. The statute, however, will not bear this construction. The result is, that while the purpose of the statute was the collection of taxes, yet it has adopted a mode that establishes the rule indicated, if it were otherwise doubtful. Practically, it can do no harm, nor can it injuriously affect the rights of the parties in interest, as it may be fairly implied that the property will sell for that much more. It is only necessary that this rule be understood, and the purchaser knowing that the taxes are to be paid out his bid will increase his bid by the amount of the taxes over the sum he would give, if he buys subject to the taxes. So it results in collecting the taxes without legal injury to either party.

But it is argued that the failure to apply for the reference before confirmation of the sale, and before the creditor has received the proceeds, is a forfeiture of the rights of the purchaser in this respect. We think clearly not. It is true the statute says that it shall be the duty of the judge, *before the sale is confirmed* to the purchaser, to make the reference as to taxes. It is not made the special duty of the purchaser to move for this reference, it is made the duty

of the judge, without motion; his over-sight or omission ought not to prejudice the right of the purchaser, his purchase was made with reference to the rule established by the statute, and the extent of his obligation and right thereby fixed. Although he becomes a *quasi* party to the cause, he does not assume its management, and if he presumes the judge will not neglect to observe the statute, his rights ought not thereby be precluded beyond recall. The mere fact that the decree confirming the sale—without, however, vesting title—is allowed to be entered before the reference, ought not to be conclusive of the question, moreover, this point was directly decided in *Ellis* v. *Foster*, 7 Heis., 131, and the taxes allowed as a credit after confirmation; not, however, upon the statute.

A strict compliance with the statute requires the reference before the sale is confirmed, but the sale notes not being due for some months, and hence no funds likely to be paid in, it would answer the purpose as well to have the reference as soon as the purchase money is due, in the meantime withholding from the purchaser a title to the land. At all events, the State would not loose the right to have the taxes thus paid, by the failure of the court to order the reference before confirmation, it might be had at any time while the fund is in the control of the court.

But it is again argued, that if the creditor—or which is the same thing, his solicitor—is allowed to receive the proceeds of the sale without any claim of this character by the purchaser, the creditor or solicitor cannot be required to refund the money. We do

18—VOL. 9.

not say that the rights to have the money refunded, would, under all circumstances, exist and be unlimited· But the notes of the purchasers in these cases were not due for several months. On the day the sale was confirmed, and before any money was paid or due, $2,000 of these notes were ordered turned over to one of the solicitors of the complainant. The purchasers could not have anticipated such an usual proceeding as this, or be held to have waived their rights by failing to be present to object, especially as during the same term of the court the order directing the notes to be so turned over, was suspended, although this was after they had been actually received. The case of *John-son* v. *Molsbee,* 5 Lea, 444, is relied upon. That, however, was where a creditor *out of court,* in good faith, and without refunding bond, collected from an administrator the amount of his debt. It was held that other creditors could not compel him to refund any part of the sum, because the estate afterwards proved to be insolvent. The question here is, whether the court, while it still has jurisdiction of the cause, and of the parties, has the right to maintain its control of the fund to the end that it be appropriated according to the rights of the parties under the law, and for this purpose to recall any part of the fund which has been inadvertently and improperly paid out, or to have returned to the office of the clerk and master, the notes or other papers properly belonging to the office. We think the court ought not to loose control of the funds or subject-matter of the litigation until it has rendered what it

assumes to be complete justice in the case. Neither the parties or their solicitors should be allowed to retain an advantage acquired under an order inadvertently made as in the present case, which results in defeating the rights of the parties, according to the settled law, especially when the order is at the same term suspended before it acquires the force of *res adjudicata.*

So far, therefore, as it may be necessary to secure to the purchasers the rights to have the existing taxes paid out of the purchase money, the order of the court requiring a return of the fund was proper. The account in this result has not been taken; but it must be borne in mind that the right of the purchaser is only to have the taxes chargeable upon the lots purchase by him, paid out of the purchase money due from him for said lots. Hence, the purchaser, Fares, cannot apply the purchase money yet due from him to the master for lots 6, 7 and 8, to the taxes on lots 16 and 17, purchased by him from Gen. Pillow, out of court. And for the same reason, the purchaser, Hill, is entitled to no decree against Harris & Pillow. The notes taken out by Gen. Pillow did not include either of the notes of Hill, nor does it appear that Gen. Pillow received any money paid in by Hill. The decree in this respect should, therefore, at all events, be modified.

From what has already been said, it follows that the court has the power to compel the return of so much of the fund as may be necessary to do justice between the solicitors. We do not mean to disturb

the amount fixed as the fee of Messrs. Harris &. Pillow. ' This is a matter between them and their client, which it has not been appealed from. But the lien declared by this court being jointly in favor of the two firms, gave to each a right which they may have adjusted between themselves, and enforced according to the rights as settled, and the court will not permit either to appropriate the whole. It appearing that after paying the taxes and costs, a sufficient sum is not left to pay both, the lien should be so enforced in their favor *pro rata.*

It is not insisted that the decree of Humes & Scott is erroneous in amount. But the remaining question is, whether upon the facts stated, Harris. is liable for the money improperly received by Pillow. It has been stated that the partnership between Harris & Pillow had been dissolved some time previous to these transactions; and that Harris did not participate in the transaction or have any knowledge in regard to it, nor did he receive any part of the money, and moreover, Pillow was indebted to him on their partnership accounts.

It will be readily conceded, that after dissolution Pillow had no right to create any obligation on Harris by contract for the creation of a debt. For that matter, we presume that even before dissolution, one partner of a law firm would have no power to create a debt obligatory upon his co-partner, in the absence of express authority, unless it be for the ordinary expenses of a law office, or possibly for books. This, for the reason that the scope of a partnership for

the practice of law does not contemplate the purchase of other property, or the transaction of such business as makes it necessary to create debts. So that no lia- bility could attach to Harris upon the ground that Pillow was authorized to create a debt in the name of a firm. We take it, however, to be the settled law, that upon dissolution, unless otherwise stipulated, either partner may proceed in the name of the firm to settle and agree with the debtor upon the amount of any debt due to the firm, and collect the same, and the firm would be as conclusively bound by his acts as if both had joined. We presume further, that upon the dissolution of a law firm, in the absence of an agreement to the contrary, either member may give his his attention to, and in the absence of the other, control any unfinished cases or business in which the firm may have been employed. In fact, in reference to the unfinished business of the firm, the rights, duties and liabilities of the members are the same after dissolution as before, unless changed by agreement. As to such business they are still part- ners, the dissolution dissolves their connection in re- spect to after-acquired business. Gen. Pillow had, therefore, the right to settle the amount of the fee due the firm in the case referred to, and collect the same, and Harris would be as conclusively bound by such act as if he had joined therein. It is clear Harris could not disregard the settlement and collection by Pillow and proceed to collect the amount again. So far, therefore, as the acts of Pillow amounted to a settlement and collection of the debt, they were clearly

obligatory upon both parties. The question is, what is the result when one partner, by inadvertence or otherwise, collect a larger sum than is due, or receives, as in this case, of a fund for their security, more than their just share? Shall the other partner be bound not only to the extent the payment was rightful, but also be liable to refund the money improperly collected without regard to whether or not he has received any part thereof?

To the extent the money received was a payment of a debt due to the firm, the money was in the hands of the firm when paid to either partner. A payment to one is a payment to both. How is it with respect to the excessive or improper collection? Undoubtedly the partner receiving the money is liable to refund. Is the other partner also liable withot regard to whether or not he has received his share? The ground upon which one partner is liable for the acts of his co-partner is upon the principle of agency, each is the agent of the other to transact all matters within the scope of the partnership business, and we have seen how far this agency extends, even after dissolution.

Now, suppose an agent receive a sum of money for his principal, inadvertently in excess of the sum he should have received, yet within the scope of his authority. Is the principal liable to refund without regard to whether the agent has accounted to him? Or is the only remedy against the agent? We take it the principal would be liable. As respects third persons, a payment to the agent is a payment to the

principal. Of course it would be different if the agent act entirely without the scope of his authority or fraudulently.

In the attitude the case stands before us, we must assume that the amount collected by Gen. Pillow was rightfully due to the firm, for the reason that it was ascertained by a decree of the court of which the client had notice, and from which she has not appealed.

It results that in collecting this fee, Gen. Pillow acted within the scope of his authority. Furthermore, a lien had been declared upon the fund for the payment of the fee, and the notes and money were turned over to Gen. Pillow under the order of the court. The payment, therefore, would have been rightful and valid if the other parties having a right to a joint participation in the fund, had not asserted their claim.

If the acts of Gen. Pillow had been positively illegal in the sense that they were in violation of positive law, or if they amounted to intentional fraud upon the rights of the other parties, or personal misconduct upon his own part as a solicitor of the court, then we should hold that in such acts his partner would not be liable. But we see no sufficient ground for such conclusion upon this record.

It was erroneous to turn over the notes to Gen. Pillow before ascertaining the taxes due and the rights of the parties, but it was not in the sense indicated an illegal act upon the part of Gen. Pillow. The fund thus received by him was at once in the hands of the firm, and Gen. Pillow was accountable to his partner for the sum thus received, and could not have

resisted the claim of the latter for a division upon the ground that too large a sum had been collected. We do not see that it changes the result that the other parties asserted their claim before the fund received was actually divided between the members of the firm of Harris & Pillow, nor is the state of the accounts between them material. The receipt of the notes and money was in the name of the firm, and was an act in which one partner had the right to bind another.

With the modifications hereinbefore indicated, the decree must be affirmed.

Judge TURNEY dissents as to the liability of defendant, Harris.